**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Thomas P. GILLESPIE, Jr.,**
**Defendant–Appellant.**

**No. 91–2593.**

United States Court of Appeals,
Seventh Circuit.

Argued April 7, 1992.

Decided Aug. 20, 1992.

As Amended Sept. 28, 1992.

Patrick Hansen, Andrew B. Baker, Jr. (argued), Asst. U.S. Attys., Office of the U.S. Atty., Dyer, Ind., for U.S.

Joseph S. Van Bokkelen, Debra L. Dubovich (argued), Goodman, Ball & Van Bokkelen, Highland, Ind., Robert L. Lewis Gary, Ind., for Gillespie.

Before FLAUM and MANION, Circuit Judges, and SHADUR, District Judge.*

FLAUM, Circuit Judge.

In October 1988, Tom P. Gillespie, Jr., honored a government subpoena by testifying before and presenting documents to a federal grand jury investigating improprieties surrounding certain contracts entered into by the City of Gary, Indiana. The inquiry focused primarily on the city's relationship with Inner City Leasing and Trucking Company and Gillespie's business, Gillespie Ford, Incorporated. Sometime during Gillespie's testimony, the government began to suspect that he had obtained unreported taxable income through his performance of municipal contracts on behalf of Inner City and, as a result, he became a potential defendant, or "target." The grand jury subsequently returned an indictment against Gillespie, charging him with one count of obstruction of justice for lying to the grand jury in violation of 18 U.S.C. § 1503, and two counts of filing false income tax statements in violation of 26 U.S.C. § 7206(1).

A jury ultimately found Gillespie innocent on the obstruction count but guilty on the two tax counts. He was sentenced to three years probation, on the conditions

* The Honorable Milton I. Shadur, District Judge for the Northern District of Illinois, sitting by designation.

that he reside for six months in a residential facility on work release, pay the cost of his confinement and prosecution, satisfy his federal tax liabilities, and perform 300 hours of community service. Gillespie appeals his conviction, challenging the admission of his grand jury testimony and the sufficiency of the evidence. His sentence was stayed pending the outcome of this appeal. We affirm.

## I.

The United States Department of Justice, as a matter of internal policy, attaches to the subpoenas of grand jury targets [1] and subjects [2] a written warning, called an "Advice of Rights" form, which states as follows:

A. The grand jury is conducting an investigation of possible violations of federal criminal law involving: (State here the general subject matter of inquiry, *e.g.*, the conducting of an illegal gambling business in violation of 18 U.S.C. § 1955).

B. You may refuse to answer any question if a truthful answer to the question would tend to incriminate you.

C. Anything that you do say may be used against you by the grand jury or in a subsequent legal proceeding.

D. If you have retained counsel, the grand jury will permit you a reasonable opportunity to step outside the grand jury room to consult with counsel if you do so desire.

U.S. Dep't of Justice, United States Attorneys' Manual, Title 9, Ch. 11, ¶ 9–11.150, at 10. According to the Manual, "[n]otwithstanding the lack of a clear constitutional imperative," these warnings are appended to target or subject subpoenas in all circumstances except those—not present here—in which notice might jeopardize the investigation. *Id.* The Manual further

provides that the prosecutor should orally deliver these warnings on the record before the grand jury, and should seek confirmation that the witness understands them. *Id.* The Manual also specifies that the government is to provide targets with special warnings—appropriately termed "target warnings"—notifying them of their status as potential defendants. *Id.* The target warnings are to be administered on the record when the target witness receives the oral Advice of Rights. *Id.*

In contravention of this policy, the government failed to warn Gillespie orally of his right against self-incrimination when he appeared before the grand jury. Nor was Gillespie orally warned that he had become a target. The parties dispute whether Gillespie received the Advice of Rights form normally attached to subpoenas; the government maintains that he did, while Gillespie argues he did not. The district court resolved this issue in Gillespie's favor—a determination with which, as discussed more fully below, we disagree—and found that the government had not effectively warned him of his rights. Despite that omission, however, the court concluded that no constitutional right to warnings against self-incrimination exists in the grand jury context, and refused to dismiss the tax charges against Gillespie or to suppress his grand jury testimony.

On appeal, Gillespie urges us to exercise our supervisory powers to suppress his grand jury testimony because the prosecutor overlooked the Department of Justice's internal guidelines in failing to provide him a target warning. Alternatively, Gillespie argues that as a grand jury witness he was constitutionally entitled to some sort of warning against self-incrimination, and that the government's failure to provide any such warning mandates suppression of his grand jury testimony.

---

1. A "target," as defined by Department of Justice guidelines, is "a person as to whom the prosecutor or the grand jury has substantial evidence linking him to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." U.S. Dep't of Justice, United States Attorneys' Manual, Title 9, ch. 11, ¶ 9–11.150, at 10.

2. A "subject" of an investigation is an individual "whose conduct is within the scope of the grand jury's investigation." U.S. Dep't of Justice, United States Attorneys' Manual, Title 9, ch. 11, ¶ 9–11.150, at 10.

## II.

 We first address the district court's determination that Gillespie did not receive an Advice of Rights form with his subpoena, for this factual issue provides a critical backdrop to our analysis. In December 1990, Gillespie filed a motion to dismiss the two tax counts on the ground that he was not given a target warning during his appearance before the grand jury. Significantly, the motion admitted that Gillespie had received the Advice of Rights form. *See* Joint Motion to Dismiss Indictment at 1–2. The accompanying memorandum likewise admitted receipt of the written warnings. *See* Memorandum in Support of Motion to Dismiss at 1. Gillespie subsequently filed a motion to suppress his grand jury testimony, alleging it was taken in violation of his fifth amendment right against self-incrimination.

At an evidentiary hearing on Gillespie's motions, the Internal Revenue Service special agent who had served Gillespie with the subpoena testified that an Advice of Rights form was attached to the subpoena when it was served. I Tr. at 8–9. He further testified that when he served the subpoena he did not wait for Gillespie to read the form, and did not at that time provide oral warnings. The government offered into evidence a certified copy of the subpoena, bearing the date the subpoena was served on Gillespie and attached to which was a proper form. *Id.* at 8–10. Gillespie then took the stand and, contrary to his motion to dismiss and accompanying memorandum, testified that he did not receive an Advice of Rights form with the subpoena. *Id.* at 13–14. He further stated that he had made a copy of the subpoena, but had left it in his file at Gillespie Ford. *Id.* at 17. Gillespie also testified that he had shown a copy of the warning-deficient subpoena to his lawyer, Robert Lewis, but Lewis declined to take the witness stand. *Id.*

The district court found this evidence inconclusive. *United States v. Gillespie*, 773 F.Supp. 1154, 1156 (N.D.Ind.1991). Reasoning that if a constitutional right to *Miranda* warnings existed in the grand jury context the government would bear the burden of showing it gave such a warning, the court determined that the government had failed to carry its "hypothetical burden" here. Although the court observed that Gillespie's testimony was "[a] peculiar turn of events given [Gillespie's] reference to the form on the first page of his 'Joint Motion to Dismiss Indictment,' " *id.* at 1156 n. 2, it concluded that the government here had not effectively warned Gillespie of his rights. The court then proceeded to reach the constitutional issue of whether *Miranda* or similar warnings are required in the grand jury context, answering the question in the negative.

We respectfully disagree with the district court's analysis. The government offered the testimony of an IRS agent who stated that the warning form was attached to the subpoena, and placed into evidence a certified copy of the subpoena and attachment. Gillespie responded by denying receipt of the warning form despite his earlier admissions to the contrary, and provided neither tangible proof—*i.e.*, his copy of the subpoena which, as noted, he claimed to have—nor the testimony of his attorney, who allegedly had viewed the subpoena *sans* warnings. After weighing this evidence, the district court nonetheless determined that the government failed to carry its burden of proof.

 Even assuming—without deciding—that the government carries the burden in this context, *cf. Medina v. California*, —— U.S. ——, 112 S.Ct. 2572, 2581, 120 L.Ed.2d 353 (1992) (government generally bears burden of proof when it seeks to introduce inculpatory evidence obtained by virtue of a waiver of, or in violation of, a defendant's constitutional rights), as applied here, the "hypothetical burden" erected by the district court placed too great an onus on the government. Indeed, we question whether the government ever could satisfy its burden under the standard applied by the district court. In other contexts involving motions to suppress in which the government bears the burden of proof, the Supreme Court has held that a preponderance of the evidence standard applies. *See, e.g.,*

*Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) (waiver of *Miranda* rights); *Nix v. Williams,* 467 U.S. 431, 444–45 n. 5, 104 S.Ct. 2501, 2509 n. 5, 81 L.Ed.2d 377 (1984) (inevitable discovery of evidence obtained by unlawful means); *United States v. Matlock,* 415 U.S. 164, 177–78 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974) (voluntariness of consent to search); *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972) (voluntariness of confession). As a general matter, "[t]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *Matlock,* 415 U.S. at 178 n. 14, 94 S.Ct. at 996 n. 14; *see also Connelly,* 479 U.S. at 169, 107 S.Ct. at 523 (quoting *Twomey,* 404 U.S. at 489, 92 S.Ct. at 626). Assuming, *arguendo,* that the burden here fell on the government, we believe the preponderance standard applies here as well.

The government easily met the preponderance standard here. It provided both the testimony of a government agent that warnings were supplied and tangible evidence of those warnings; Gillespie offered his own testimony, which was inconsistent with his prior admissions, and nothing more. Although we are mindful of the deference we must give to a district court's credibility determinations, here we are "left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Our view is buttressed by the fact that even the district court acknowledged that Gillespie's testimony was "[a] peculiar turn of events" given his prior admissions. We find the district court's determination that the government did not attach an Advice of Rights to Gillespie's subpoena to be clearly erroneous, and that the government demonstrated by a preponderance of the evidence that it had attached an Advice of Rights to Gillespie's subpoena. With this in mind, we turn to Gillespie's contention that we should exercise our supervisory power to suppress his grand jury testimony.

### III.

■ Gillespie concedes—as he must— that target warnings are not constitutionally mandated. *See United States v. Washington,* 431 U.S. 181, 189, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977); *United States v. Burke,* 781 F.2d 1234, 1245 (7th Cir. 1985). He urges us nonetheless to exercise our supervisory powers to suppress his grand jury testimony, contending that because the executive branch has instituted an internal policy to provide target warnings, the courts must enforce that policy when it has been circumvented or ignored in order to prevent discretionary or nonuniform application. We decline to take the course Gillespie champions.

Gillespie cites various cases in which courts have exercised or threatened to exercise their supervisory authority over grand jury proceedings, *see, e.g., United States v. Jacobs,* 547 F.2d 772 (2d Cir.1976), *cert. granted,* 431 U.S. 937, 97 S.Ct. 2647, 53 L.Ed.2d 254 (1977), *cert. dismissed,* 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978); *United States v. Crocker,* 568 F.2d 1049 (3d Cir.1977), but all preceded *United States v. Williams,* —— U.S. ——, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), and *Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), which express the Supreme Court's most recent views on the extent of federal courts' supervisory authority in the grand jury context. Both *Williams* and *Nova Scotia* articulate clear limits on our authority to exercise our supervisory powers as a means of imposing preferred policies in the absence of any constitutional or congressional imperative.

*Williams* held that a district court may not dismiss an otherwise valid indictment because the government failed to disclose substantial exculpatory evidence in its possession to the grand jury. The government in *Williams* had failed to present the exculpatory evidence despite an internal Department of Justice policy, similar to that at issue here, requiring it to do so. U.S. Dep't of Justice, United States Attorneys' Manual, Title 9, Ch. 11, ¶ 9–11.233, at 88. Despite this internal regulation, *Williams*

held that its violation will not cause an indictment to be dismissed. The Court recognized that "the federal courts 'may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress,'" — U.S. at —, 112 S.Ct. at 1741 (quoting *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983)), but observed that this principle deals "strictly with the courts' power to control their *own* procedures." *Id.* (emphasis in original). Although *Nova Scotia,* decided four years prior, recognized that a court may use its supervisory power to dismiss an indictment because of prosecutorial misconduct before the grand jury, according to *Williams* that power is limited to instances "where that misconduct amounted to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'" *Id.* (quoting *United States v. Mechanik,* 475 U.S. 66, 74, 106 S.Ct. 938, 943, 89 L.Ed.2d 50 (1986) (O'Connor, J., concurring in judgment)). Courts may not use their supervisory power "as a means of prescribing [those] standards of prosecutorial conduct in the first instance." *Id.* — U.S. at —, 112 S.Ct. at 1742. After *Williams,* then, nothing short of a violation of laws or procedural rules regulating grand jury matters will permit a court to exercise its supervisory authority in the grand jury arena.

*Bank of Nova Scotia* similarly circumscribed the scope of our supervisory authority over grand jury proceedings. There, the defendant sought dismissal of the indictment; the Court held that an indictment may not be dismissed for prosecutorial misconduct in grand jury proceedings absent prejudice to the defendant. 487 U.S. at 255, 108 S.Ct. at 2373.

In light of these admonitions, we decline to invoke our supervisory authority to suppress Gillespie's grand jury testimony. Although suppression of testimony is a less extreme sanction than the outright dismissal of the indictment contemplated in *Williams* and *Nova Scotia,* the reasoning undergirding those decisions is equally applicable here. The Supreme Court has delineated a very limited scope for our supervisory powers; *Williams,* in particular, clearly circumscribes the application of that power to cases involving the violation of the Constitution, applicable statutes, and the Federal Rules of Criminal Procedure. The prosecutor's failure to provide Gillespie with target warnings in contravention of the Department's internal policy is not error of the nature that calls for the exercise of our supervisory powers.

This is not to say that we condone the prosecutor's conduct, especially given the use of Gillespie's grand jury testimony at trial. We are particularly troubled by a representation the prosecutor made at the evidentiary hearing:

> There is nothing more that the Government in my opinion should have done in this case than was done. To make a practice of admonishing every single witness that comes before the Grand Jury as to their rights, I don't believe that is required, and I don't believe that is necessary. And quite frankly, I don't believe that would be good policy to do so.

I Tr. at 21. As the government concedes, Gillespie was a subject of the investigation even at its outset, and therefore should have received at least subject warnings in accord with the Department's policy. In light of the above statement, "[w]e are left with the uneasy feeling that certain prosecutors feel free to ignore precatory judicial statements of concern about the failure to provide grand jury targets with warnings." *United States v. Pacheco–Ortiz,* 889 F.2d 301, 310 (1st Cir.1989).

Few restraints protect targets appearing before grand juries, particularly in the wake of *Williams. See* Lee Hamel, *Forcing Prosecutors to Do the Right Thing,* Connecticut Law Tribune, at 17 (June 29, 1992) (commenting on *Williams'* removal of the "threadbare robes of fairness" that had previously existed). One protection to which a target remains entitled is the conscientious and dutiful conduct by the prosecutor, who "is an administrator of justice, an advocate, and an officer of the court." *Id.* (quoting American Bar Ass'n Standards Relating to the Admin. of Crim. J.). We

emphasize that "[t]he duty of the prosecutor is to seek justice, not merely to convict." *Id.* (quoting same). In failing to adhere to internal policy, and in representing to the district court that advising witnesses of their rights is not necessarily "good policy," the prosecutor in this case—even if inadvertently—undermined the Department of Justice's commitment to fairness.

Because, however, there is no indication that the government acted in bad faith in failing to provide the target warnings, or that it proffered an affirmative misrepresentation to Gillespie regarding his target status, we limit ourselves to verbal admonitions. In a case such as this, even if we were at liberty to exercise our supervisory powers we would hesitate to do so, lest the government be reluctant to establish internal rules designed to safeguard defendants in the first instance. As we observed in denying a request to invoke our supervisory power in *United States v. Schwartz*, 787 F.2d 257, 267 (7th Cir.1986):

> The Department of Justice may give such weight as it chooses to its internal rules. In all but the most exceptional cases, he who writes the rules may choose the sanctions for noncompliance.... [A]n effort to foist on the Executive Branch a sanction it does not wish could lead the Executive Branch to abandon [its] policy rather than suffer unwarranted reversals. Neither defendants nor courts would benefit from such an outcome.

We agree with Gillespie that, given the rule's existence, every effort should be made to apply it uniformly. However, Gillespie's conviction on the income tax counts was not the product of manifestly improper conduct by federal officials. *See United States v. Babb*, 807 F.2d 272, 279 (1st Cir. 1986). Moreover, the error was, under the totality of the circumstances, harmless. *See Nova Scotia*, 487 U.S. at 255, 108 S.Ct. at 2373. Gillespie was an experienced businessman with three years of college education, and had run the auto dealership for a number of years. He not only received the Advice of Rights, but consulted with a defense attorney prior to appearing before

the grand jury as well. In view of these circumstances, we do not find this a proper case in which to exercise our supervisory powers.

■ We are faced, then, with "the violation of a policy which does not justify a case-related judicial sanction and yet which appears immune to expressions of judicial dissatisfaction." *Pacheco–Ortiz*, 889 F.2d at 310–11. And, as did the First Circuit in *Pacheco–Ortiz*, we hereby give notice that alternative avenues to secure enforcement of the Department's internal practice may be pursued in the future. Therefore, we will, in appropriate circumstances, consider referring internal policy violations to the Department's Office of Professional Responsibility for a report concerning the steps the Department proposes to take to police its internal policy guidelines and to discipline those of its employees who choose not to follow them. *See id.* at 311. This comports with *Nova Scotia*, which directs that the focus be placed upon the responsible individual—*i.e.*, the prosecutor who failed to adhere to internal policy-and that the responsibility be placed upon the accountable agency—*i.e.*, the Department of Justice. *See* 487 U.S. at 263, 108 S.Ct. at 2378. The prospect of such enforcement, we trust, will prove an adequate deterrent to violations of policies designed to ensure a fair judicial process.

## IV.

■ We next turn to Gillespie's constitutional claim. Although Gillespie acknowledges that *Miranda* warnings *per se* are not required in the grand jury context, *see Washington*, 431 U.S. at 185–86, 97 S.Ct. at 1817–18; *United States v. Mandujano*, 425 U.S. 564, 580, 96 S.Ct. 1768, 1778, 48 L.Ed.2d 212 (1976) (plurality opinion), he asserts that *some* type of notice against self-incrimination is constitutionally required. The Supreme Court has left open the question whether grand jury witnesses are entitled to fifth amendment warnings. *Washington*, 431 U.S. at 186, 97 S.Ct. at 1818; *see also Mandujano*, 425 U.S. at 582 n. 7, 96 S.Ct. at 1779 n. 7 (plurality opinion). Given the state of flux on this issue, we

must determine whether the Advice of Rights form Gillespie received provided a constitutionally sufficient warning.

Gillespie maintains that the warnings were constitutionally deficient, arguing that "a written paper received days before questioning does not satisfy the constitutional mandates. A defendant testifying before a grand jury has a constitutional right to warnings immediately prior to questioning." Appellant's Br. at 8. The district court fully discussed the relevant Supreme Court precedent, and we will not repeat that extensive and thoughtful discussion here. It is well established that witnesses appearing before the grand jury enjoy the protection of the fifth amendment privilege against self-incrimination, *Counselman v. Hitchcock*, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), but it likewise is "axiomatic that the Amendment does not automatically preclude self-incrimination, whether spontaneous or in response to questions put by government officials." *Washington*, 431 U.S. at 186, 97 S.Ct. at 1818. The constitutional guarantee "is only that the witness be not *compelled* to give self-incriminating testimony." *Id.* at 188, 97 S.Ct. at 1819 (emphasis in original). "All *Miranda's* safeguards, which are designed to avoid the coercive atmosphere, rest on the overbearing compulsion which the Court thought was caused by isolation of a suspect in police custody." *Id.* 431 U.S. at 187 n. 5, 97 S.Ct. at 1819 n. 5.

In light of the Supreme Court's dicta over the last two decades, *see, e.g., Minnesota v. Murphy*, 465 U.S. 420, 427, 431, 104 S.Ct. 1136, 1142, 1144, 79 L.Ed.2d 409 (1984); *Mandujano*, 425 U.S. at 578–82, 96 S.Ct. at 1777–79 (plurality opinion), we believe the written warnings provided Gillespie were not constitutionally defective. That the Supreme Court would be reluctant to extend a warning requirement to grand jury proceedings is strongly alluded to in *Williams*, which listed numerous constitutional protections afforded in criminal proceedings that have "no application" before the grand jury. *See Williams*, — U.S. at ——, 112 S.Ct. at 1743 (listing examples). The Court further observed that "although

'the grand jury may not force a witness to answer questions in violation of [the fifth amendment's] constitutional guarantee' against self-incrimination, our cases suggest that an indictment obtained through the use of evidence previously obtained in violation of the privilege against self-incrimination 'is nevertheless valid.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 346, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974)). In our view, this dicta implies strongly that the Court would be disinclined to extend warning rights, at least beyond the Advice of Rights given to Gillespie, to grand jury witnesses.

We also find persuasive the expansive dicta in *Minnesota v. Murphy, supra,* which held that a statement made by a probationer to his probation officer without prior warnings is admissible in a subsequent criminal proceeding. As the district court discussed at length, *see* Op. at —— ——, *Murphy* explicitly, and repeatedly, compared the probationer's situation to that of a grand jury witness in declining to afford the probationer *Miranda* or *Miranda*-like protections:

> First, the probation officer could compel Murphy's attendance and truthful answers.... In our view, this factor subjected Murphy to less intimidating pressure than is imposed on grand jury witnesses, who are sworn to tell the truth and placed in a setting conducive to truthtelling. Although warnings in both contexts might serve to dissipate any possible coercion or unfairness resulting from a witness' misimpression that he must answer truthfully even questions with incriminating aspects, we have never held that they must be given to grand jury witnesses, and we decline to require them here since the totality of the circumstances is not such as to overbear a probationer's free will.

465 U.S. at 431, 104 S.Ct. at 1144 (quotations omitted); *see also id.* at 427, 104 S.Ct. at 1142; *id.* at 432, 104 S.Ct. at 1144. *Murphy* observed the circumscribed nature of "custody" for *Miranda* purposes—"formal arrest or restraint on freedom of movement of the degree associated with formal

arrest"—noting that the extraordinary protection provided by *Miranda* warnings is inapplicable outside the context of the inherently coercive custodial interrogations for which it was designed. *Id.* at 430, 104 S.Ct. at 1143.

Similarly, a plurality in *United States v. Mandujano* had explicitly distinguished the " 'compulsion' thought to be inherent in police station interrogations" from the "other official investigations where there are often impartial observers to guard against intimidation or trickery." 425 U.S. at 579, 96 S.Ct. at 1778. The Court observed the "marked contrasts" between custodial interrogation and a grand jury investigation, *id.* at 580, 96 S.Ct. at 1778, and stated, "To extend [*Miranda* ] to questioning before a grand jury inquiring into criminal activity under the guidance of a judge is an extravagant expansion never remotely contemplated by this Court in *Miranda*; the dynamics of constitutional interpretation do not compel constant extension of every doctrine announced by the Court." *Id.*

Gillespie maintains, however, that *Mandujano* and its progeny hold· only that *Miranda* warnings *per se* are not required. It is true that the Court has explicitly reserved the question whether *any* warnings are constitutionally required, finding the warnings in both *Mandujano* and *Washington* sufficient to satisfy any constitutional mandate that might exist. *See Mandujano*, 425 U.S. at 582, 96 S.Ct. at 1779, *Washington*, 431 U.S. at 186, 97 S.Ct. at 1818. Gillespie argues that these cases support the conclusion that *some* constitutionally sufficient warning is required, *see United States v. Pacheco–Ortiz*, 889 F.2d at 308 (noting that First Circuit in *United States v. Babb*, *supra*, had assumed that some warning was constitutionally mandated in grand jury proceeding) (emphasis in original), and that the warnings provided here fail to meet even minimal constitutional standards. We disagree.

Courts confronting this issue have uniformly suggested that any *Miranda*-type warnings that may be applicable in the grand jury context are minimal at best.

The Supreme Court in such cases has explicitly distinguished the custodial nature of police interrogations from the grand jury context. We have differentiated the two as well, and indicated our reluctance to extend a warning requirement beyond the custodial context. In *United States v. Jackson*, 836 F.2d 324 (7th Cir.1987), for example, we rejected the defendant's contention that he was entitled to *Miranda* warnings at a bankruptcy hearing, observing that our obligation is to follow Supreme Court precedent, not contract or expand it, and noting our rigid adherence to the mandate of the Court. *Id.* at 327. The defendant, we noted, although compelled to testify at the bankruptcy proceeding, was not in police custody with respect to a criminal investigation, and had offered no reasons why he should not be subject to the rule that "if a witness under compulsion to testify makes disclosures instead of claiming the [fifth amendment] privilege [against self-incrimination], the government has not 'compelled' him to incriminate himself." *Id.* (quoting *Murphy*, 465 U.S. at 427, 104 S.Ct. at 1142); *see also Williams v. Chrans*, 945 F.2d 926, 951 & n. 42 (7th Cir.1991) (no duty to give *Miranda* warnings or procedural safeguards effective to secure the privilege against self-incrimination in context of questioning by probation officer) (listing cases), *cert. denied*, —— U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992).

Moreover, here Gillespie consulted with an attorney before appearing before the grand jury, thus indicating that he was not quite as naive as his arguments might indicate. That he consulted with counsel is relevant to our determination. *See, e.g., Roberts v. United States*, 445 U.S. 552, 560–61, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622 (1980); *Williams*, 945 F.2d at 951. Although the written warnings here were admittedly minimal, we find that they were nonetheless constitutionally sufficient. Gillespie also maintains that the lack of contemporaneity between the warnings and his appearance before the grand jury (the subpoena was served nine days prior) render them insufficient, but we find the temporal gap insufficient to render the warn-

ings constitutionally infirm. The Advice of Rights was sufficient to satisfy any fifth amendment right to which Gillespie may have been entitled in appearing before the grand jury.

## V.

■ Gillespie's final argument—which merits only limited discussion—is that insufficient evidence exists to sustain the jury's verdict. It is well established that a defendant making a sufficiency challenge bears a heavy burden. *United States v. Scroggins,* 939 F.2d 416, 421 (7th Cir.1991); *see United States v. Williams,* 951 F.2d 853, 858 (7th Cir.1992). We will uphold the jury's verdict if, "viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)); *see also United States v. Brimberry,* 961 F.2d 1286 (7th Cir.1992).

Gillespie maintains that the government failed to present adequate evidence of willfulness. *Cheek v. United States,* — U.S. —, 111 S.Ct. 604, 112 L.Ed.2d 617 (1990), held that the standard for statutory willfulness in criminal tax prosecutions is the "voluntary, intentional violation of a known legal duty." *Id.* at —, 111 S.Ct. at 610. We find the evidence sufficient to support the jury's verdict that Gillespie willfully and knowingly filed false federal income tax returns in violation of 26 U.S.C. § 7206(1).

Gillespie managed his father's business, Gillespie Ford, from 1984 through 1986, and became president of the company upon his father's death in 1987. During this period, Thomas Johnson was the owner of Inner–City Leasing and Trucking Company. *As Gillespie's grand jury testimony establishes, Johnson* and Gillespie had an agreement in which Gillespie Ford would bid the City of Gary fuel contract and subcontract it to Inner–City. In return, Johnson would give Gillespie Ford all his business and pay Gillespie $15,000 a year as a "consulting fee." *Johnson's brother,*

*Jerry, president of Inner–City,* testified *at trial* that Gillespie Ford successfully bid on a contract with the City of Gary and turned it over to Inner–City, that he and Gillespie discussed the consulting service payments in 1986, and that Gillespie shipped Inner–City an invoice for consulting services. Inner–City eventually paid Gillespie—with several checks bearing the notation "consulting services"—approximately $8,500 in "consulting fees" in 1985, and $20,000 in 1986, none of which appeared on Gillespie's 1985 and 1986 income tax returns.

Gillespie maintains that Johnson "had no first-hand knowledge regarding the purpose for which the checks were written to Gillespie," and that Johnson's testimony that he marked the checks with "consulting services" notations and that Gillespie cashed those checks is insufficient to sustain the burden of knowing conduct on Gillespie's part. Appellant's Br. at 22–23. We disagree. Gillespie testified that he was generally familiar with taxes and taxable income. Before the grand jury, he testified that his consulting service payments were offset by bonus income taken from him and paid on the Inner–City accounts. Subsequently, at trial, aware that his grand jury statement would not comport with Gillespie Ford's financial records, Gillespie testified that the checks represented loans or repayments of loans.

The record as a whole supports the jury's finding that Gillespie knowingly filed false income tax returns which understated his income. "Knowledge and belief are characteristically questions for the factfinder, in this case the jury." *Cheek,* — U.S. at —, 111 S.Ct. at 611. The evidence is more than sufficient for a rational trier of fact to conclude that Gillespie willfully attempted to evade paying income taxes on his so-called "consulting fees."

AFFIRMED.